**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:18-cv-2784 (CJN) |
| CENTRAL INTELLIGENCE AGENCY, | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION</u>

The American Civil Liberties Union has sued to enforce a request under the Freedom of Information Act, 5 U.S.C. § 552, seeking documents relating to the nomination of Gina Haspel to serve as Director of the Central Intelligence Agency.  *See generally* Compl., ECF No. 1.  The CIA withheld in full or in part hundreds of responsive records, *id.* ¶ 14, and now moves for summary judgment on the grounds that Exemptions 1, 3, 5, and 6 justify the withholdings.  *See generally* Def.'s Mot. for Summary Judgment ("Def.'s Mot."), ECF No. 25.  For the reasons discussed below, the Court grants the CIA's motion for summary judgment.

### I.      Legal Standards Applicable to FOIA

FOIA "requir[es] federal agencies to make their records available to the public upon request."  *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015); *see* 5 U.S.C. § 552(a)(3).  But FOIA also provides that agencies may withhold from disclosure information that falls within one of nine enumerated exemptions.  *See United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021); *see* 5 U.S.C. § 552(b).  Those nine "exemptions are explicitly made exclusive and must be narrowly construed."  *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011).

Furthermore, as of 2016, an agency may only withhold information under an exemption if the agency "reasonably foresees that disclosure would harm an interest protected by [the] exemption" or if "disclosure is prohibited by law." *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 357–58 (D.C. Cir. 2021) (quoting 5 U.S.C. § 552(a)(8)(A)(i)). The agency carries the burden of proving the applicability of an exemption and showing either a foreseeable risk of harm or that the law prohibits disclosure. *See Petroleum Info. Corp. v. Department of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015) (quotation omitted) (noting that district courts must review *de novo* the agency's justification for non-disclosure).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An agency may attempt to meet its summary judgment burden through a declaration or an affidavit, but conclusory declarations or affidavits "that merely recite statutory standards or are overly vague or sweeping" will not suffice. *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

In cases involving significant withholdings, agencies often provide a so-called *Vaughn* index "to enable the court and the opposing party to understand the withheld information" and to "address the merits of the claimed exemptions." *Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 150 (D.C. Cir. 2006); *see also Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) (originating the term "*Vaughn* index"). An adequate *Vaughn* index "provide[s] a relatively

detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).  The *Vaughn* index, in other words, must "state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant."  *Founding Church of Scientology of Wash., D.C. v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

FOIA requires that even where a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed.  5 U.S.C. § 552(b); *see Porup v. Cent. Intel. Agency*, 997 F.3d 1224, 1238 (D.C. Cir. 2021) (quotation omitted) ("FOIA provides that any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."); *see also Porup*, 997 F.3d at 1238 ("We have held that a trial court must make a segregability finding if a federal agency has redacted or withheld documents pursuant to FOIA exemptions.").  An "agency must provide a detailed justification" for its determination that non-exempt materials cannot be segregated from exempt materials, but the agency need not "provide so much detail that the exempt material would be effectively disclosed."  *Johnson v. Exec. Office for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quotation omitted); *Mead Data Cent., Inc.*, 566 F.2d at 260 (noting that a "document must be disclosed unless they are inextricably intertwined with exempt portions").  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

FOIA also permits a district court to "examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions."  5 U.S.C. § 552(A)(4)(B).  Courts engage in such inspection when doing so would

assist with evaluating an agency's invocation of an exemption or a claim of nonsegregability.  *See Tax Analysts v. I.R.S.*, 414 F. Supp. 2d 1, 5 (D.D.C. 2006).  "A representative document," rather than all the requested and responsive documents, "may be selected for in camera inspection." *Env't Prot. Agency v. Mink*, 410 U.S. 73, 93 (1973).  The district court has "broad discretion" to decide whether conducting in camera inspection would be helpful.  *Am. C.L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 626 (D.C. Cir. 2011) (quotation omitted).  And, as a general rule, a court need not conduct in camera review where the agency has provided sufficient, noncontradictory information for the court to conclude an exemption applies or that segregability is not an option. *See Mobley v. C.I.A.*, 806 F.3d 568, 588 (D.C. Cir. 2015).

## II.      Factual and Procedural Background

Gina Haspel joined the CIA in 1985 and was employed at the agency for several decades. *See* Compl. ¶ 2.  The ACLU asserts that, as a senior CIA employee during President George H.W. Bush's administration, Haspel oversaw the alleged torture of detainees at CIA black sites.  *See* Pls.'s Mem. in Opp'n to Def.'s Mot. for Sum. J. ("Pls.'s Opp'n"), ECF No. 27 at 10.  And the ACLU asserts that she later played a role in destroying evidence of the alleged torture.  *Id.*

In March 2018, President Donald Trump nominated Haspel for the position of Director of the CIA.  *See* Compl. ¶ 2.  The CIA, as the ACLU sees it, undertook an "overt public campaign to influence the legislative branch's consideration of Haspel." *Id.* ¶ 3.[1]  To do so, the ACLU alleges, the CIA declassified "select information perceived as favorable to Haspel," disseminated to the media "carefully selected facts" about the nominee, and leveraged its press office to spin a charitable narrative.  *Id.*  The positive spin, according to the ACLU, did not go unnoticed.  *Id.* ¶ 5.

_____

[1] The American Civil Liberties Union and the American Civil Liberties Union Foundation brought this lawsuit.  *See* Compl. ¶¶ 17–18.  The Court refers to both as the American Civil Liberties Union or the ACLU throughout the opinion.

Several Senators voiced concerns to the CIA about the Agency withholding classified material that could prove harmful to Haspel's nomination. *Id.* In response, the CIA promised to share additional declassified information with the public about the nominee. *Id.* The CIA declassified additional information a week later. *Id.* ¶ 8. But that declassified information, in the ACLU's view, once again portrayed Haspel in a positive light and misled the public about Haspel's past actions and her potential conflict of interest. *Id.*

In May 2018, while Haspel's nomination was still pending, the ACLU submitted a FOIA request to the CIA for records "related to the CIA's influence campaign to support Haspel's nomination, and to Haspel's potential conflict of interest in serving as the classification authority over her own actions in the CIA's program of prisoner torture and abuse." *Id.* ¶ 11.[2] The Senate confirmed Haspel as Director of the CIA two weeks later. *Id.* ¶ 13.

The ACLU filed this lawsuit in November 2018. *See generally id.* About fifteen months later, the CIA issued its final response to the FOIA request. *See* Declaration of Vanna Blaine ("First Blaine Decl."), ECF No. 25-2 at ¶ 8. The CIA identified hundreds of records responsive to the ACLU's request, releasing some in redacted form and withholding many in full pursuant to a variety of exemptions under FOIA. *Id.* ¶ 14.

Thereafter, the CIA moved for summary judgment. *See* Def.'s Mot. The CIA supported its motion with both a declaration prepared by CIA official Vanna Blaine, who holds the authority

---

[2] Specifically, the ACLU seeks records related to "(1) the selective declassification of information concerning Haspel; (2) whether Haspel serves as the original classification authority over information concerning her own participation in abuse, torture, rendition, and detention, and any consideration of possible conflict of interest in this position; (3) communications between CIA personnel and journalists; (4) communications between current CIA personnel and former CIA employees; (5) CIA decisions to promote coverage deemed favorable of Ms. Haspel; (6) CIA resources expended to support Haspel's nomination; (7) actions undertaken by career, nonpolitical CIA employees; (8) coordination with nongovernmental actors including public relations firms; (9) CIA guidance on use of Agency resources to promote nominees; and (10) communications from CIA staff to the White House." *Compl.* ¶ 20.

to determine whether records should be classified, and with a *Vaughn* index.[3]  *See* First Blaine Decl.; *see also* CIA's First *Vaughn* index ("First *Vaughn* index"), ECF No. 25-4.  The ACLU opposed the motion, contending that the Agency failed to meet the requirements of the invoked exemptions and that the Agency provided inadequate explanations for why it could not segregate disclosable, non-exempt information from the non-disclosable, exempt information.  *See generally* Pls.'s Opp'n.  The ACLU did not and has not challenged the adequacy of the Agency's search. *See* Def.'s Reply to the Pls.'s Mot. in Opp'n, ("Def.'s Reply"), ECF No. 29 at 7.  With its reply in support of its motion, the CIA submitted a second declaration and a revised *Vaughn* index.  *Id.*; *see also* Second Declaration of Vanna Blaine ("Second Blaine Decl."), ECF No. 29-1; CIA's Second *Vaughn* index ("Second *Vaughn* index"), ECF No. 29-2.

　　The Court held a hearing on the motion in July 2021.  *See* Minute Order, July 8, 2021. Following the hearing, the CIA again revised its *Vaughn* index and submitted a third declaration. *See* Supplemental Material, ("Def.'s Supp. Mat."), ECF No. 40; *see also* Third Declaration of Vanna Blaine ("Third Blaine Decl."), ECF No. 40-1; CIA's Third *Vaughn* index ("Third *Vaughn* index"), ECF No. 40-2.  During this period, the Agency re-reviewed all 129 entries, ultimately disclosing some additional information to the ACLU.  *See* Def.'s Consent Motion, ECF No. 38 at 1.  The Court also conducted an in camera review of twelve documents on the *Vaughn* index.  *See* Notice of Submission of Material for In Camera Review, ECF No. 37.[4]

---

[3] The Parties have agreed that the *Vaughn* index need not contain an entry for every responsive record, but that it may instead describe a representative sample of the responsive records.  *See* Pls.'s Opp'n at 16.  The third *Vaughn* index contains a total of 129 Entries.  *See* ECF No. 29-2.  Entries 1–16 represent a sample of the documents the agency released in redacted form (10% of the 160 redacted documents).  *See* First Blaine Decl. ¶ 14.  Entries 17–129 represent a subset of the documents the CIA withheld in full (50% of 225, which represents a subset of the 473 redacted documents).  *Id.*
[4] The Court reviewed in camera the material underlying Entries 35, 36, 45, 66, 77, 85, 105, 106, 119, 124, 126, and 129.  *See* Minute Order, July 8, 2021.

### III.   The CIA's Withholdings under Exemption 1

Exemption 1 permits an agency to withhold information "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" so long as that information has been "properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  To rely on Exemption 1, an agency has the burden of showing that it has complied with the "classification procedures established by the relevant executive order" and has withheld "only such material as conforms to the order's substantive criteria for classification." *King v. Dep't of Justice*, 830 F.2d 210, 214 (D.C. Cir. 1987); *see also Lesar v. Dep't of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980) ("To be classified properly, a document must be classified in accordance with the procedural criteria of the governing Executive Order as well as its substantive terms.").  Courts tend to defer to an agency's invocation of Exemption 1 because "the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects might occur as a result of public disclosure of a particular classified record." *Larson*, 565 F.3d at 864.

Here, the CIA invokes Executive Order 13526 as the basis for its Exemption 1 withholdings of portions of 46 entries on the *Vaughn* index.[5]  That Executive Order, among other things, governs the classification of national security information and permits information to be classified "only if . . . the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security," and "the original classification authority is able to identify or describe the damage." E.O. 13526 §§ 1.1(a)(4), 1.4.  It also provides that when an agency receives a FOIA request, the agency may "classif[y] or reclassif[y]" information responsive to the request "only if such classification . . . is accomplished on a document-by-document basis with the personal

---

[5] Entries 17, 18, 20, 28, 29, 30, 31, 32, 34, 35, 38, 42, 47, 48, 51, 52, 64, 65, 66, 68, 70, 71, 75, 76, 77, 78, 79, 80, 81, 82, 85, 86, 91, 93, 94, 95, 96, 98, 99, 104, 108, 110, 114, 117, and 127.  *See* Third *Vaughn* Index.

participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order." E.O. 13526 § 1.7(d). According to Executive Order 13526, then, information is shielded from a FOIA request under Exemption 1: if (1) an original classification authority classified the information; (2) the federal government owns, produces, or controls the information; (3) the information pertains to one of eight categories listed in § 1.4 of the Executive Order; and (4) the original classification authority determines that "the unauthorized disclosure of the information reasonably could be expected to result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damages." *See James Madison Project v. U.S. Dep't of Just.*, 436 F. Supp. 3d 195, 201 (D.D.C. 2020). In evaluating whether the agency has satisfied the criteria, courts "afford substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record, and little proof or explanation is required beyond a plausible assertion that information is properly classified." *Shapiro v. Dep't of Justice*, 239 F. Supp. 3d 100, 121 (D.D.C. 2017) (quotation omitted).

Relying on the declarations of Vanna Blaine, who holds the authority to determine whether documents are properly classified, the CIA has established that each of the Executive Order's four requirements are met here. First, an original classification authority properly classified the information at issue. Second, the records in question were produced by, and remain under the control of, the federal government. Third, the withheld information falls under classification category § 1.4(c) of Executive Order 13526 (which allows the agency to classify information concerning "intelligence activities (including covert action), intelligence sources or methods, or cryptology").[6] And fourth, the withheld information remains classified because the disclosure of

---

[6] Blaine declares that the information withheld information pursuant to § 1.4(c) consists of (i) identifying information regarding covert personnel; (ii) codewords; (iii) covert CIA locations; (iv) information that would tend to reveal

this information could reasonably be expected to result in damage to national security.  *See* First Blaine Decl. ¶ 16.[7]

The Court's in camera review of the material underlying Entries 35, 66, 77, and 85, which all involve withholdings under Exemption 1, supports this conclusion.  *See* Minute Order, July 8, 2021.  As a result, the Court concludes that the CIA has put forth plausible assertions that its Exemption 1 withholdings conform to FOIA and the applicable executive order.

The ACLU challenges the CIA's withholdings "insofar as the CIA argues that those withholdings are not segregable from other, non-exempt information."  Pls.'s Opp'n at 38 n.26.  But the CIA is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007); it has engaged in multiple segregability reviews; and the Court's in camera review of the material underlying Entries 35, 66, 77, and 85, together with Blaine's declarations, support the CIA's position on segregability.

The ACLU also argues that "[i]f the CIA has indeed withheld information on Haspel's classification authority and conflict of interest under Exemption 1, it has not sufficiently justified its withholdings."  Pls.'s Opp'n at 40.  The ACLU might have a point if the CIA did in fact withhold under Exemption 1 information regarding Haspel's classification authority and alleged conflict of interest.  But the Second Blaine declaration states that the CIA has not withheld any information under Exemption 1 on the ground that it related to Haspel's original classification or any potential

---

specific intelligence sources, methods, and/or activities; and (v) classification and dissemination control markings.  *See* First Blaine Decl. ¶¶ 17-22.

[7] Take, for example, the description in the *Vaughn* index corresponding to Entry 17.  That entry consists of information about CIA personnel, intelligence sources, and secretive activities that would likely jeopardize national security interests if disclosed.  *See* Third *Vaughn* Index at 9.  The other entries involving Exemption 1 withholdings include similar descriptions.

conflict of interest, *see* Second Blaine Decl. ¶ 10, and the ACLU has provided no reason to second-guess this representation.

## IV.   The CIA's Withholdings under Exemption 3

Exemption 3 allows an agency to withhold material if authorized by federal statute.  *See Yunes v. United States Dep't of Just.*, 263 F. Supp. 3d 82, 86 (D.D.C. 2017).  The statute's nondisclosure provision must either (1) require that the relevant "matters be withheld from the public in such a manner as to leave no discretion on the issue;" or (2) establish "particular criteria for withholding or refer to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A).  Exemption 3 differs from other FOIA exemptions in that it "depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage."  *James Madison Project v. Dep't of Just.*, 208 F. Supp. 3d 265, 289 (D.D.C. 2016) (quotation omitted).  To withhold records under Exemption 3, then, the agency need only show that "the statute claimed is one of exemption as contemplated by Exemption 3" and that "the withheld material falls within the statute."  *Larson*, 565 F.3d at 865.

### A.  The National Security Act

The National Security Act represents an exempting statute for purposes of FOIA Exemption 3.  *See ACLU v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011).  Section 102(A)(i)(1) of the Act provides that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  The Director of the CIA also possesses authorization under the National Security Act to protect CIA sources and methods from unauthorized disclosure.  *See Fitzgibbon v. C.I.A.*, 911 F.2d 755, 760 (D.C. Cir. 1990).  When the CIA invokes the National Security Act in relation to Exemption 3, the key question becomes "whether the withheld material relates to intelligence sources and methods."

*Larson*, 565 F.3d at 865; *Lindsey v. Fed. Bureau of Investigation*, 490 F. Supp. 3d 1, 15 (D.D.C. 2020).

The CIA has invoked the National Security Act to withhold portions of 78 of the entries on the *Vaughn* index that if disclosed, the Agency contends, would reveal intelligence sources and methods.[8]  In her first declaration, Blaine states that the information withheld pursuant to the National Security Act includes the identities of covert personnel, code words, covert CIA locations, clandestine intelligence methods and activities, and classification and dissemination control markings.  First Blaine Decl. ¶ 17.  Though some of the material withheld under Exemption 3 overlaps with material withheld under Exemption 1, the CIA posits that Exemption 3 also shields additional material not covered under Exemption 1, such as "unclassified intelligence methods pertaining to the Agency's manner in which it protects its intelligence," disclosure of which "could significantly impair the CIA's ability to carry out its core mission of gathering and analyzing foreign intelligence."  Def.'s Mot. at 18.

The Court concludes that the CIA has satisfied its burden of showing that the material withheld pursuant to the National Security Act relates to intelligence sources and methods.  The Court also concludes that the material withheld under Exemption 3 pursuant to the National Security Act falls within that statute's coverage.  The Court's in camera review of the material underlying Entries 35, 66, and 85, which all involve withholdings pursuant to the National Security Act under Exemption 3, supports this conclusion.  *See* Minute Order, July 8, 2021.

The ACLU does not attack this conclusion head on, but instead argues that the description of intelligence sources and methods in the Blaine declaration is so vague that it is impossible to

---

[8] Entries 9, 13, 15, 17, 18, 19, 20, 21, 22, 23, 24, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 46, 47, 48, 49, 50, 51, 52, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 104, 108, 110, 114, 117, and 127.  *See* Third *Vaughn* Index.

tell whether the CIA agency has invoked Exemption 3 over unclassified information or both classified and unclassified information. *See* Pls.'s Opp'n at 50. In her first supplemental declaration, however, Blaine declared that the CIA did not withhold any information on the ground that it related to Haspel's classification authority or any potential conflicts of interest as a result of such authority. *See* Second Blaine Decl. ¶ 10. Instead, where the CIA withheld responsive information under Exemption 3, it did so because the records were otherwise exempt for reasons unrelated to her classification authority or possible conflict of interest. *Id.* Not only has the ACLU failed to overcome the presumption of good faith afforded to a government official's detailed and non-conclusory declaration, *see Freedom Watch v. Bureau of Land Mgmt.*, 220 F. Supp. 3d 65, 70 (D.D.C. 2016), but the Court's in camera review of certain material underlying specific withholdings pursuant to the National Security Act under Exemption 3 buttresses the declarant's representations.

## B. The CIA Act

The Central Intelligence Act is also an exempting statute for purposes of FOIA Exemption 3. *See Am. C.L. Union v. Cent. Intel. Agency, No. CV 16-1256 (EGS)*, 2021 WL 5505448, at *4 (D.D.C. Nov. 24, 2021). Section 6 of the CIA Act provides that "the Agency shall be exempted from . . . the provisions of any other law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507. To invoke the CIA Act, the agency "need only show . . . that the withheld material falls within a statute meeting the exemption's conditions." *See DiBacco v. Dep't of the Army*, 926 F.3d 827, 835 (D.C. Cir. 2019) (quotation omitted).

The CIA has invoked the Act to redact under Exemption 3 portions of over 100 of the entries on the *Vaughn* index on the basis that if disclosed, CIA employees' names and personal

identifiers would come to light.[9]  Def.'s Mot. at 24.  The Agency, in other words, withheld "names and other personally-identifying information consisting of email addresses, Agency identification numbers, telephone numbers, locations, official titles, and core functions of CIA employees."  *Id.* at 19.  The Court finds that the Agency's withholdings fall within the scope of the CIA Act.

The ACLU does not oppose this conclusion in general, but questions whether disclosable information relating to Haspel's classification authority was swept up with non-disclosable material withheld under Exemption 3.  *See* Pls.'s Opp'n at 50.  Again, however, in her first supplemental declaration, Blaine declared that the Agency did not "withhold any information on the ground that it related to Haspel's original classification or any potential conflict of interest as a result of such authority."  Second Blaine Decl. ¶ 10.  Instead, the Agency withheld portions of certain responsive records for other reasons covered by the CIA Act.  *Id.*  The ACLU has not provided a sound basis for overcoming the presumption that Blaine's declarations were made in anything but good faith.  And the Court's in camera review of the material underlying Entries 35, 36, 45, 66, 77, 85, 105, 106, and 129 supports the declarant's representations.  *See* Minute Order, July 8, 2021.

## V.  The CIA's Withholdings under Exemption 5

FOIA's Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  That Exemption "incorporates the privileges available to Government agencies in civil litigation," including, as relevant here, the deliberative process privilege and the attorney-client privilege.  *See United States Fish & Wildlife Serv.*, 141 S. Ct. at 785.

---

[9] Entries 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 110, 114, 117, 126, 127, 128, and 129.  *See* Third *Vaughn* Index.

### A.  The Deliberative Process Privilege

The deliberative process privilege "shields from disclosure documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *Id.* (quotation omitted).  The privilege seeks to facilitate candid communication among public officials, as it "blunts the chilling effect that accompanies the prospect of disclosure."  *Id.*; *see also Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 8–9 (2001) (noting that the "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news").

To qualify for the deliberative process privilege, the agency must demonstrate the material is (1) pre-decisional, (2) deliberative, and (3) that it is reasonably foreseeable that release of the material would cause harm to an interest protected by that privilege.  *See Reps. Comm. for Freedom of the Press*, 3 F.4th at 361; *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015) (Kavanaugh, J.).  A document counts as pre-decisional when it was "generated before the agency's final decision on the matter," "as opposed to documents that embody or explain a policy that the agency adopts." *United States Fish & Wildlife Serv.*, 141 S. Ct. at 786 (noting that the key "is not whether a document is last in line, but whether it communicates a policy on which the agency has settled").  A document counts as "deliberative" when it was "prepared to help the agency formulate its position." *Id.*; *Reps. Comm. for Freedom of the Press*, 3 F.4th at 364 (describing deliberative documents as those involving the "type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve the undercover policy that sits at the heart of the deliberative process privilege").  And it is reasonably foreseeable that the release of the material would cause harm to an interest protected by that

privilege when the agency "concretely explains how disclosure would—not could—adversely impair internal deliberations." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369–70.  That showing turns on "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.*

The CIA has invoked the deliberative process privilege to withhold under Exemption 5 portions of over 100 of the entries on the *Vaughn* index.[10]  The descriptions accompanying each entry invoking this privilege vary, sometimes significantly.  The description accompanying Entry 19, for instance, states that the withheld document "consists of an email exchange between a Senior Agency official and Agency personnel discussing whether to conduct news media engagement and intra-agency outreach regarding a response from a U.S. Senator on Haspel's nomination," which if disclosed would "reveal [pre-decisional] internal agency deliberations on this subject."  *See* Third *Vaughn* Index at 10–11.  Entry 26, as another example, states that the withheld document "consists of an email between Agency personnel forwarding draft talking points to address Senate inquiries addressed to Haspel as the nominee for CIA Director with an attachment of the draft language," which if disclosed would "reveal [pre-decisional] internal agency deliberations on the draft talking points."  *Id.* at 18.  And Entry 126 states that the withheld document "consists of an email exchange between Agency personnel discussing a specific issue regarding whether to include particular information in a publication about Haspel's career," the disclosure of which

---

[10] Entries 2, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, and 128.  *See* Third *Vaughn* Index.

would divulge "preliminary internal Agency deliberations on information included in a publication." *Id.* at 110.

Though the descriptions differ, the documents have a common thread:  They are draft documents, email exchanges, and preliminary communications in response to Senate, White House, and media inquiries.  Draft documents, emails providing input on draft documents, and communications regarding how to respond to inquiries generally (but not always) constitute pre-decisional and deliberative intra-agency correspondence.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (noting that Exemption 5 "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency");  *Blank Rome LLP v. Dep't of the Air Force*, No. 15-CV-1200-RCL, 2016 WL 5108016, at *5 (D.D.C. Sept. 20, 2016) (quotation omitted) ("Draft documents, by their very nature, are typically pre-decisional and deliberative.");  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 364 (holding that emails that document ongoing internal debates and contain back-and-forth and the exchange of ideas are pre-decisional and deliberative);  *Am. Ctr. for L. & Just. v. United States Dep't of State*, 330 F. Supp. 3d 293, 302 (D.D.C. 2018) ("[T]he deliberative process privilege applies to documents generated in the crafting of an agency's public statements.").

Here, the CIA has sufficiently demonstrated that the drafts it withheld are subject to the deliberative process privilege.  As reflected in the Blaine declarations, these draft documents "reflect the CIA's internal and confidential decision-making process during Haspel's nomination process for CIA Director."  First Blaine Decl. ¶ 31.  Moreover, the descriptions accompanying the relevant entries make clear that the Agency did not treat the documents as final, but rather as preliminary versions subject to feedback and change.  As Blaine stated in her declaration, the

16

documents "do not convey final Agency viewpoints on a particular matter, but rather reflect different considerations, opinions, and approaches that preceded the Agency's final decision regarding the nomination process." *Id.* The Court concludes that the draft documents withheld pursuant to the deliberative process privilege were both pre-decisional and deliberative. And for similar reasons, the same goes for the emails providing input on draft documents and the communications regarding how to respond to inquiries.

The ACLU argues that, at least as to certain documents, the CIA has failed to provide detailed and individualized descriptions of the nature of the specific deliberative process involved, the significance of the document in that process, and the nature of the decisionmaking authority vested in the document's author and recipient of each record the Agency claims is pre-decisional and deliberative. *See* Pls.'s Opp'n at 24–26. This argument, however, overlooks the revisions the CIA made to the *Vaughn* index as well as the additional details provided in the revised declarations. Both the revised *Vaughn* index and the second supplemental declaration provide additional detail regarding the nature of the deliberative processes associated with several of the withheld documents and further demonstrate the applicability of the deliberative process privilege. Plus, the Court's in camera review clarified who authored the documents, who received the documents, as well as the significance of the documents, and further supports the CIA's argument that these documents are covered by the deliberative process privilege.

But that does not end the matter. In addition to having to show that the material is pre-decisional and deliberative, the CIA must show that it is reasonably foreseeable that its release would cause harm to an interest protected by the privilege. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369–70. To do so, the agency must explain "how disclosure would—not could—adversely impair internal deliberations," which turns on "a focused and concrete demonstration of

why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.*

The CIA has demonstrated that harm is reasonably foreseeable if agency employees expect that their deliberations about efforts to support future nominations to high profile positions like the Director of the CIA will be publicly disclosed. *See* Def.'s Supp. Mat. at 1. In particular, in her second supplemental declaration, Blaine states that disclosure would "discourage" employees "from providing particularly useful knowledge, perspectives, and opinions and prevent the Agency from benefitting from their skill in Haspel's nomination process and future nominations." Third Blaine Decl. ¶ 8. Such disclosures, according to Blaine, would also "inhibit open and candid discussions that would provide pertinent information related to and about the nominee, Agency policy, and Agency positions, that are necessary for accurate and complete responses" to inquiries. *Id.* Put differently, disclosure would "chill the free flow of open discussions during a very high profile nomination process." *Id.* ¶ 9. Revealing the draft material would also "reveal Agency considerations of material it . . . otherwise discarded." *Id.* ¶ 10. And disclosure could also "mislead or confuse the public by disclosing rationales that were not the basis for the Agency's final decision." *Id.* The Court's in camera review of the material underlying Entries 35, 36, 45, 66, 77, 85, 105, 106, 119, 124, and 126, which all involve withholdings pursuant to the deliberative process privilege, supports the conclusion that disclosure of the material would harm and impede the agency going forward. *See* Minute Order, July 8, 2021.

The ACLU argues that, in attempting to demonstrate foreseeable harm, the CIA has improperly relied on "broad categorical justifications rather than evaluating the harm posed by each disclosure, and their predictions of harm consist entirely of conclusory, boilerplate generalities and speculation." Pls.'s Response to Defendant's Second Supplemental Declaration

And *Vaughn* Index ("Pls.'s Response"), ECF No. 41 at 2.  Not so.  In her first declaration, Blaine discussed her familiarity "with all of the documents withheld in full and in part pursuant to the deliberative process privilege," and that "[d]isclosure of any of these documents would inhibit the frank communications and free exchange of ideas that the privilege is designed to protect."  First Blaine Decl. ¶ 34.  "If the withheld information were released, CIA employees may hesitate to offer their candid opinions to superiors or coworkers, and such self censorship would tend to degrade the quality of Agency decisions."  *Id.*  Blaine also explained that "revealing this information could mislead or confuse the public by disclosing rationales that were not the basis for the Agency's final decisions."  *Id.*  In her third declaration, and as already discussed, Blaine provided further detail about the harm disclosure of the withheld material would cause the agency. *See* Third Blaine Decl.

## B.  The Attorney-Client Privilege

The attorney-client privilege aims "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169–170 (2011) (quotation omitted).  To establish that the attorney-client privilege applies in the FOIA context, an agency must show that (1) "the information in [the] documents was communicated to or by an attorney as part of a professional relationship," (2) "the information is confidential," and (3) the "communication is based on confidential information provided by the client."  *Mead Data Cent., Inc.*, 566 F.2d at 253–54;  *Pub. Citizen, Inc. v. United States Dep't of Educ.*, 388 F. Supp. 3d 29, 40 (D.D.C. 2019) (noting that the privilege must also be claimed and not waived by the client).  "In the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys'

for the purposes of attorney-client privilege." *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 802 F.Supp.2d 185, 200 (D.D.C. 2011).

The CIA has invoked the attorney-client privilege to withhold portions of 25 of the entries on the *Vaughn* Index.[11]   *See* Def.'s Mot. at 24.   Though the descriptions of the material withheld under the attorney-client privilege differ here and there, each includes reference to communication between and among CIA attorneys and officials about legal positions.   Take, as a representative example, the description accompanying Entry 66.   That description states that the withheld document "consists of email communications from a CIA Attorney to a Senior Agency official discussing a legal position on a particular Agency specific issue about Haspel as the CIA Director nominee," which constitutes "legal advice provided by OGC attorneys that was solicited by an Agency component."   Third *Vaughn* Index at 55–56.   That description, and others like it, describes agency employees requesting legal advice in connection with confidential information.   In her first declaration, moreover, Blaine explains that the information CIA withheld as protected by the attorney-client privilege consists of confidential communications between agency officials or agency personnel and attorneys within the CIA's Office of General Counsel.   *See* First Blaine Decl. ¶ 35.   The Court's in camera review of the material underlying Entries 36, 66, 85, 105, and 106, which all involve withholdings pursuant to the attorney-client privilege, supports Blaine's assertion.   *See* Minute Order, July 8, 2021.   The Court, in short, concludes that the CIA properly invoked the attorney-client privilege to withhold material under Exemption 5.

The ACLU argues that the CIA has failed to offer sufficient facts establishing that the assessment or advice contained in each record rests on confidential disclosures.   *See* Pls.'s Opp'n

---

[11] Entries 36, 44, 64, 66, 67, 72, 74, 80, 85, 87, 88, 93, 94, 95, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, and 127. *See* Third *Vaughn* Index.

at 36.   Stated differently, the CIA, from the ACLU's perspective, has not put forth facts "establishing that the records for which the CIA asserts the attorney-client privilege contain information that was, and remains, confidential, and that was communicated to CIA attorneys for the primary purpose of seeking legal advice." *Id.* at 41.   The Court disagrees; the CIA has established that the withheld records include attorney communications that are based upon confidential communications.   Indeed, Blaine has declared that the CIA withheld "confidential communications between Agency officials or Agency personnel and attorneys within the CIA's Office of General Counsel."  First Blaine Decl. ¶ 35.   And to reiterate, the Court's in camera review of the material underlying Entries 36, 66, 85, 105, and 106, which all involve withholdings pursuant to the attorney-client privilege, supports Blaine's assertion.  *See* Minute Order, July 8, 2021.   Plus, the ACLU has failed to explain what additional relevant information the CIA could provide without disclosing the privileged contents of the communications.

The ACLU argues that the CIA has failed to explain how disclosing the information over which it asserts the attorney-client privilege could harm an interest protected by the privilege.  *See* Pls.'s Opp'n at 46.   Yet Blaine has declared that if the confidential attorney-client communications were disclosed, "it would subject the legal guidance to scrutiny and reveal preliminary legal risk analysis and strategy."   Blaine Decl. ¶ 35.   And in her third declaration, Blaine provided further detail about the harm disclosure of the withheld material would cause the agency.  *See* Third Blaine Decl.   These assertions are supported by the Court's in camera review of the material underlying Entries 36, 66, 85, 105, and 106.  *See* Minute Order, July 8, 2021.

### VI.   The CIA's Withholdings under Exemption 6

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).   "Similar files" include "detailed Government records on an individual which

can be identified as applying to that individual." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146–47 (D.C. Cir. 2015) (quotation omitted). Exemption 6 also covers "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *Judicial Watch, Inc.*, 449 F.3d at 152 (quotation omitted). For Exemption 6 to apply, the disclosure must compromise a privacy interest. *See Prison Legal News*, 787 F.3d at 1147. The agency may satisfy its burden of showing a substantial invasion of privacy through affidavits containing "reasonable specificity of detail rather than merely conclusory statements." *Besson v. United States Dep't of Com.*, No. 18-CV-02527 (APM), 2020 WL 4500894 (D.D.C. Aug. 5, 2020) (quotation omitted). If the information does implicate a significant privacy interest, the Court must "balance the individual's right of privacy against the public interest in disclosure." *See Prison Legal News*, 787 F.3d at 1147. The FOIA requester must satisfy its obligation to articulate a significant public interest sufficient to outweigh the individual's privacy interest. *Pinson v. Dep't of Just.*, 236 F. Supp. 3d 338, 367 (D.D.C. 2017).

Here, the CIA has invoked Exemption 6 for portions of 115 of the entries on the *Vaughn* index that if disclosed, the Agency contends, would reveal "identifying information of CIA employees, non-agency government personnel, and other third-parties unaffiliated with the Agency."[12] Def.'s Mot. at 24. In her first declaration, Blaine states that the information, if released, could subject the identified persons to "to harassment, embarrassment, or unwanted contact." First Blaine Decl. ¶ 37. Blaine also states that our adversaries, if they got their hands on the withheld information, "could use this information to target individuals overtly associated with the intelligence agency and expose them to threats of violence or intimation in an effort to unlawfully obtain access to national security information." *Id.*

---

[12] Entries 109, 111, 112, 113, 115, 116, 118, 119, 120, 121, 122, 123, 124, and 125 constitute the only documents with respect to which the CIA did not assert Exemption 6. *See* Third *Vaughn* Index.

The Court concludes that the CIA has satisfied its burden of showing through the *Vaughn* index and the Blaine declarations—which contain reasonably specific details rather than merely conclusory statements—that release of the withheld information would result in a substantial invasion of privacy to CIA personnel.  The Court also concludes that the ACLU has not set forth a countervailing public interest that would outweigh these important privacy interests.  What's more, the Court's in camera review of the material underlying Entries 35, 36, 45, 66, 77, 85, 105, 106, 126, and 129, which all involve withholdings pursuant to Exemption 6, supports these conclusions.  *See* Minute Order, July 8, 2021.

## VII.    The CIA's Segregability Analysis

FOIA requires that if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b).  To establish that all such information has been disclosed, an agency needs to show "with reasonable specificity" that the information it has withheld cannot be further segregated.  *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578–79 (D.C. Cir. 1996) (quotation omitted); *Canning v. DOJ*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which may be overcome by some "quantum of evidence" by the FOIA requester.  *Sussman*, 494 F.3d at 1117.

The CIA has taken multiple cracks at segregating non-exempt material from exempt material.  In her latest declaration, Blaine states that she has "again conducted a page-by-page, line-by-line review and ha[s] determined that" "no reasonably segregable non-exempt and meaningful information [is] left to disclose."  Third Blaine Decl. ¶ 14; *see also* First Blaine Decl. ¶ 39 (declaring that "no segregable, non-exempt portions of documents could be released without potentially compromising classified or privileged information or other information protected under

the FOIA"); Second Blaine Decl. ¶ 11 ("I have again conducted a page-by-page, line by-line review of the documents at issue in this case and have determined that there is no reasonably segregable non-exempt and meaningful information left to disclose.").

Yet Blaine concedes, in her latest declaration, that the two previous "page-by-page, line-by-line" reviews missed some non-exempt material. Third Blaine Decl. ¶ 14. On the one hand, that concession cuts against the CIA, as it casts doubt on the thoroughness of its original segregability analysis. On the other hand, the CIA's willingness to review the material yet again and disclose more non-exempt material at this stage is commendable. The Court does not, of course, wish to discourage agencies from disclosing material that earlier on had been erroneously withheld. On the whole, the Court concludes that the CIA has satisfied its segregability requirements. The Court's in camera review also supports the conclusion that the CIA has adequately segregated exempt from non-exempt material. *See* Minute Order, July 8, 2021.

The ACLU's principal response is that the CIA has failed to explain "how or why it previously failed to segregate the materials disclosed last month—which amount to more than 100 pages that were neither protected nor inextricably intertwined with exempt material." Pls.'s Response at 8. The ACLU has a point. After all, the CIA should not have had to conduct multiple "line-by-line" reviews to locate all the segregable and non-exempt information (and the CIA's original position, of course, was that it had already done so). But the CIA did, to its credit, identify additional material upon further review and has on multiple occasions segregated non-exempt information and provided an accounting for its determinations. Based on the entire record, the Court concludes that that the CIA has satisfied its segregability obligations.

## VIII.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**. An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  February 2, 2022

CARL J. NICHOLS
United States District Judge